# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **EDWARD D. MCDONALD** | **CIVIL ACTION**<br>**NO. 16-1325-SM-SS** |
| **VERSUS** | **JUDGE SUSIE MORGAN** |
| | **MAGISTRATE JUDGE** |
| **CAROLYN COLVIN, ACTING**<br>**COMMISSIONER OF SOCIAL SECURITY** | **JANIS VAN MEERVELD** |

## REPORT AND RECOMMENDATION

The plaintiff, Edward D. McDonald ("McDonald"), seeks judicial review, pursuant to Section 405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying his claim for disability insurance benefits and a period of disability under Title II of the Social Security Act ("Act"), 42 U.S.C. § 423. The matter has been fully briefed on cross-motions for summary judgment. For the following reasons, IT IS RECOMMENDED that: (1) the Commissioner's motion for cross-motion for summary judgment (Rec. doc. 13) be GRANTED; and (2) McDonald's motion for summary judgment (Rec. doc. 12) be DENIED.

### Procedural Background

On August 26, 2013, McDonald completed an application for disability insurance benefits alleging a disability onset date of February 7, 2013.  R. at 156-59.  McDonald described his disabling conditions as bipolar, asthma, paranoid schizophrenia and dyslexia.  R. at 178.

McDonald was born on March 19, 1963, and was 52 at the time of onset of the alleged disability.  R. at 72.  At the time of the hearing, he had lived in a mobile home with his wife of 20 years.  R. at 72.  He completed school through the seventh grade.  R. at 81. Prior to the alleged

disability onset date, McDonald worked as a driver of trucks and large dump trucks.  R. at 74.  His last employment was in February 2013 as a truck driver.  R. at 73.   He ceased working because he started to cough and become short of breath while working, which he attributed to coming into contact with chemicals while hooking up hoses on the job. R. at 73.

On January 3, 2014, the Commissioner determined that McDonald was not disabled and denied his claim for benefits.  R. at 94-104.  There was a hearing before an Administrative Law Judge ("ALJ") on July 1, 2014.  R. at 64-92.  On October 20, 2014, the ALJ issued an unfavorable decision finding that McDonald had not been under a disability within the meaning of the Act from date of alleged onset through the date of decision.  R. at 47.  The ALJ concluded that McDonald has the severe impairments of reactive airway disease and chronic sinusitis, but rejected McDonald's contention that he has severe hypertension, sleep apnea or bipolar disorder with psychosis. R. at 49-52. The ALJ held that McDonald's breathing disorders did not meet or medically equal the severity of one of the listed impairments in 20 CFR Part 404. R. at 53-53. The ALJ found that McDonald retains the residual functional capacity ("RFC") to perform medium work as defined in 20 CFR 404.1567(c) with occasional lifting and carrying of 50 pounds and frequent lifting and carrying of 25 pounds, standing and walking for up to six hours in an eight-hour work day and sitting for up to six hours in an eight-hour work day, but that he should avoid even moderate exposure to fumes, odors, dusts, gases, poor ventilation and pulmonary irritants in the work place. R. at 53. The ALJ concluded that McDonald cannot perform his past relevant work, but that considering his age, education, work experience and RFC, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including bench assembler, sorter, cafeteria attendant and escort vehicle driver. R. at 57.

McDonald asked the Appeals Council to review the ALJ's conclusions. R. at 41. He presented additional evidence related to a January 30, 2015 cervical spine MRI. R. at 7-37, 252. On December 30, 2015, the Appeals Council denied the request for review. R. at 1-5. In so doing, the Appeals Council did not consider the new evidence because that evidence is about a time period after the date through which the ALJ's decision was made. R. at 2.

On February 17, 2016, McDonald filed a complaint in federal court for review of the Commissioner's decision. (Rec. Doc. 1). The Commissioner answered and filed the administrative record. (Rec. Docs. 11, 12) The parties filed cross-motions for summary judgment. (Rec. Docs. 12, 13).

<u>Statement of Issue on Appeal</u>

Whether substantial evidence supports the failure to find a severe mental disorder and the residual functional capacity finding.

<u>Evidence in the Record</u>

I.    <u>Medical Records</u>

Aside from hospitalization in 1987,[1] it appears that McDonald first reported psychological issues to a medical care provider in April 2013. Earlier in 2013, he had visited medical providers for other complaints and, to the extent psychiatric/behavioral/mood was reviewed, McDonald was determined to be oriented to place, time and person, and not nervous or anxious.[2]

---

[1] Form filled out by Nurse Practitioner Kevin Mixon on July 3, 2013, notes that McDonald had been an inpatient at Charity Hospital in New Orleans in 1987 with a diagnosis of bipolar. R. at 306. Notes of NP Mixon dated June 10, 2013, report that in the past, McDonald was told he might be schizophrenic but more likely bipolar, R. at 297).

[2] January 11, 2013, visit with Jiveshwar Kumar, M.D., R. at 402 ("The patient is not nervous/anxious" and was "oriented to person, place and time."); February 22, 2013, visit with Ghiath M. Mikdadi, M.D., R. at.445 (patient had "alert and normal affect" and was "oriented to time, place and person."); March 8, 2013, McDonald visit with Arvind Yertha, M.D, R. at 265 (patient "affect and judgment normal", "oriented to person, place and time" and "no distress"); April 10, 2013, McDonald returned to Dr. Yertha, R. at 269 (patient "psychiatric/behavioral – negative" and "oriented to person, place and time and well-developed, well-nourished and in no distress")

On April 25, 2013, McDonald was seen by Jennifer Thomas, a nurse practitioner at Northshore Internal Medicine Associates.  R. at 333.  He complained of three weeks of disturbed sleep cycle, fatigue, paranoid thoughts, behavior anxiety and depression.  He reported a lot of personal stress as he was out of work for several weeks due to his physical illness.[3]  His physical condition had improved significantly over the preceding week.  He had anxiety about returning to work.  He had difficulty concentrating, which was described as "likely partially situational."  His mind was constantly racing.  He had difficulty falling asleep and maintaining it.  He slept two to three hours per night.  He felt fatigued during the day.  He had no suicidal ideation.  He reported a remote history of alcohol and substance abuse, but no recent use.  R. at 333.

On the systems review for psychiatric/behavioral, NP Thomas marked McDonald positive for disturbed wake/sleep cycle, dysphoric mood, decreased concentration and agitation.  The review was negative for suicidal ideas, hallucinations, confusion and self-injury.  He was nervous and anxious.  He was not hyperactive.  For the physical exam, his speech and judgment were normal.  His mood appeared anxious.  He was withdrawn.  His thought content was paranoid and delusional.  He expressed no homicidal or suicidal ideation or plans.  R. at 339.  Prestiq and Seroquel were prescribed.  R. at 340, 411.  He was referred to psychiatry.  R. at 411.

On April 30, 2013, McDonald's wife reported to Northshore Internal Medicine Associates that McDonald was taking the prescribed medication but was still paranoid and not sleeping well.  R. at 546.

---

[3] McDonald had visited Dr. Kumar in January and February with complaints of cough, upper respiratory infection and resulting in a diagnosis of dysphagia, fatigue, hyperlipidemia, hypertension and sleep apnea. R. at 400-402. He also visited Dr. Mikdadi twice in February with complaints of shortness of breath and indications of angina, and once in March to follow up on test results. R. at 496, 499-500, 450-52. In March, McDonald visited Dr. Yertha for an evaluation of dyspnea. R. at 263.

On May 2, 2013, McDonald was seen by NP Thomas for a follow-up. She noted that his dosage of Pristiq would be increasing at the end of the week.  His dosage of Seroquel would also be increasing over time. NP Thomas and McDonald discussed that the therapeutic effects of Pristiq would not be immediately appreciable.  His sleep had improved.  He had decreased episodes of startled awakenings.  He felt less fatigued and noticed improvement in his concentration.  He still felt anxious, but there was a slight improvement.  NP Thomas and McDonald discussed that the Pristiq would reduce his anxiety. He still had paranoid delusions.  A CT of the brain showed cerebral atrophy.  This was consistent with his alcohol abuse.  It was not related to his current symptoms. R. at 342

On June 10, 2013, McDonald was seen by Kevin Mixon, a nurse practitioner in psychiatry at Northshore Psychiatric Care, who prescribed Depakote.  The Seroquel dosage was decreased. The Pristiq was stopped.  R. at 297-301.  Treatment notes indicate McDonald reported recent "racing thoughts" "very delusional ideas", "anger outbursts," "mood swings" and that he was "hyper" and "restless." R. at 297. No description of delusions were noted. He was diagnosed with bi-polar disorder. R. at 301. The prescriptions were signed by Dr. James Sholtz.  R. at 302.

On July 3, 2013, NP Mixon filled out a Behavioral Health Questionnaire for McDonald's short term disability claim wherein NP Mixon reported that McDonald was "psychotic & in a mixed bipolar state" and that he was not able to return to work full time. He referred to the June 10, 2013 examination. R. at 306.

On July 10, 2013, McDonald was seen by NP Mixon, who reported that McDonald had been on a trip with his wife.  It went well but he still was not sleeping.  His mind raced. NP Mixon assessed McDonald as alert, rather flat, with a mood that was even to depressed.  The medication

was changed.  He was to return in one month.  R. at 294.  Dr. Sholtz signed a prescription for Effexor, Depakote, Seroquel and Trazodone.  R. at 295.

On August 12, 2013, McDonald returned to NP Mixon, who noted that he was doing a little better with the changes.  R. at 291.  Dr. Sholtz signed a prescription to stop Effexor, reduce the Seroquel dosage and increase the Trazadone dosage.  R. at 292.

On August 27, 2013, McDonald returned to Dr. Yertha for a follow-up for asthma.  Dr. Yertha assessed McDonald's mood, affect and judgment as normal and described him as alert and oriented to person, place and time.  R. at 348-350.

On September 11, 2013, McDonald returned to NP Mixon, who noted that he was no longer on workers' compensation.  NP Mixon assessed McDonald as alert, rather flat, with no overt paranoia. His medication was adjusted.  He was return for a follow-up in six weeks.  R. at 289-90.

On October 23, 2013, McDonald returned to NP Mixon. McDonald was diagnosed with a mood disorder and a history of substance abuse.  NP Mixon questioned whether McDonald was suffering from bipolar disorder, noting "still doesn't seem bipolar?" and adding "past elevation [sic] possibly substance related." He was to follow-up in three months.  Medication was prescribed. R. at 285-86.

On December 16, 2013, Sandra Durdin, Ph.D., conducted a psychological evaluation at the request of the State of Louisiana Disability Determination Services in conjunction with McDonald's application for disability benefits under Social Security. She reported that he alleged "bipolar, asthma, paranoid schizophrenia, dyslexia, and a learning disability." She noted that he "related in a neutral manner, and had an angry demeanor from the start." She reported that he had "No credible hallucinations," that his thought content was organized and goal directed, that his abstract reasoning and judgment were average and that he reported social issues with authority.

She found that he had "[s]erious credibility issues" and found "[i]nconsistencies on [t]esting, atypical psychotic allegations without evidence of thought disorder." She noted that his "schizophrenic diagnosis was given in the 1980's while he was on drugs, by his report." She diagnosed malingering, substance/medication induced depressive disorder, alcohol use disorder (in sustained remission); cocaine use disorder (in sustained remission); benzodiazepine use disorder – misuse of Xanax in the prior year; other substance use disorder; and unspecified personality disorder. She concluded that he was not impaired in his ability to carry out simple instructions, handle repetitive, detailed instructions, and sustain attention for two-hour blocks of time. She also concluded that for low demand work, he could withstand routine demands, pressure or expectations, and that if sober and maintaining his mental disorder treatment regimen, he could sustain productivity over a forty hour work week. R. at 310-13.

The Disability Determination and Transmittal forms include an assessment by Cheryl Marsiglia, Ph.D. made in December 2013. She determined McDonald's affective disorders were non-severe. She found his difficulty in maintain social functioning was mild and secondary to his interpersonal issues with authority. She found no restriction of activities of daily living and she found he had no difficulty in maintaining concentration, persistence or pace. She found no evidence of schizophrenia or any type of psychotic disorder. R. at 99-100.

Michael Coogan, M.D., performed the Residual Functional Capacity portion of the Disability Determination forms. He noted that McDonald had a history of emotional problems but that current evidence shows he is able to think, communicate and care for his own needs. He also noted that McDonald can get along with others, do his usual activities and remember and follow basic instructions. R. at 103-104.

On January 27, 2014, McDonald reported to NP Mixon that he felt about the same. He was fighting for disability. The insurance company required more paperwork. He stopped his medications because he could no longer afford them and he felt horrible coming off of Effexor. He needed to convert his medication to generics. He was diagnosed with depression. He was to return in one month. R. at 324. On February 24, 2014, Dr. Sholtz completed a questionnaire form and reported on McDonald's January 27, 2014, mental exam. He indicated that he began treating McDonald in June 2013 and noted a diagnosis of bipolar. He reported that McDonald was alert; his behavior and speech were slowed; his mood was even to depressed; the affect was flat; his judgment and insights were limited. There was no current psychosis and no cognitive impairment. Dr. Sholtz also reported that when McDonald was last seen, he had run out of Effexor and Depakote and was despondent, depressed, slow and not functioning because he was off of medication. Dr. Sholtz noted that McDonald could not afford counseling and his insurance had stopped paying for medication. R. at 326-28.

On February 10, 2014, McDonald returned to NP Thomas for a follow-up. The diagnoses included anxiety and depression with paranoid delusions. He was on Celexa and Depakote. Occasionally he used Seroquel for insomnia. She reported that he was doing well on this regime. He felt his symptoms were well-controlled. R. at 356.

On February 13, 2014, NP Thomas completed a disability form for CIGNA Insurance. The diagnoses were anxiety, depression, reactive airway disease, chronic sinusitis and recurrent bronchitis. She opined that he should avoid stress, long periods of driving, and chemical exposure. R. at 331.

On March 17, 2014, NP Mixon noted that McDonald was about the same.  His mood seemed even. NP Mixon noted "still have to question baseline level of functioning." McDonald had experienced a significant weight gain.  R. at 509.  Dr. Sholtz prescribed medication.  R. at 514

On June 9, 2014, McDonald was seen by Dr. Sholtz.  He reported that McDonald did not talk and that McDonald's wife reported McDonald was withdrawn, that "he can't communicate" and "I'm tired of getting hollered at."  He complained of a roaring in his head.  R. at 511.  Depakote, Trazadone and Effexor were prescribed.  R. at 512.

On June 29, 2014, Dr. Sholtz completed a mental residuary functional capacity form assessing McDonald.  R. at 516-19. He checked boxes for "extreme" or "marked" impairments in all categories of social interaction, including ability to respond appropriately to criticism from supervisors, and ability to respond appropriately to co-workers or peers. R. 516. He also checked boxes for "extreme" or "marked" in all categories of ability to concentrate and persistence, including ability to perform work tasks in a normal work day at a consistent pace, ability to carry through instructions and complete tasks independently, and ability to perform at production levels expected by most employers. R. 517.

On September 14, 2014, McDonald was seen by Dr. Sholtz.  R. 510. Medication was prescribed.  R. at 513.

II.     Claimant's Forms

In conjunction with his social security disability application, McDonald's wife filled out a Function Report for him on September 25, 2013. R. at 188. She reported that he did not sleep well, and would check to see if anyone was stealing anything at night. R. at 189. She described household activities and chores that McDonald performed including taking care of the dogs, mowing the lawn on the riding mower, performing other yard work,  preparing simple meals,

shopping for groceries, gas, medication and doing the banking, reading the bible, playing guitar, and going to church. R. at 189-92. She reported that McDonald could not be around crowds, and that he gets along with police but not others, noting that he gets angry if they do or say something he does not like. R. at 193-934. She reported that he does not handle stress well. R. at 194. She also reported that McDonald might be driving and then all of a sudden something would make him paranoid. R. at 195. In one instance, they had to pull over the car and she took over driving. A R. at 195.

McDonald also filled out a Function Report for himself on September 26, 2013. In the section regarding how his conditions limit his ability to work, he reported "after working for a little wile [sic] me and my boss get into it and I quit cause [sic] he is out to get me I try to hold my temper but I jest [sic] can't." R. at 197. He also reported that he has been fired or laid off because of problems getting along with other people because they try to make him do things he does not want to do. R. at 203. With regard to household activities, he reported that he feeds the pets, helps his wife get up in the morning because she has multiple sclerosis, makes simple meals, and with breaks, he washes dishes, does laundry and mows the lawn. R. at 198-99.

III.    Testimony at the Hearing

At the hearing before the ALJ, McDonald testified that around the time he began having breathing problems at work he also became paranoid about the chemicals he was being exposed to and he became anxious. R. at 74-75. He stated that he "was just nervous around people" and that his "mind would be racing." R. at 75. When asked about triggers for his anxiety, he agreed that stressful situations like testifying at the hearing caused anxiety. R. at 75.  He stated he would be nervous around the people at work, especially his superiors, but that "basically at home I don't get anxious" R. at 75-76. He was asked about his problem of hearing voices or being paranoid of

people, and he stated "[t]hat's better with the medication. Yes, it is." R. at 76. At the time of the hearing, he was taking Depakote and Effexor, Seroquel and Trazadone.  R. at 85.

   He testified that he was sometimes fatigued and sometimes could not concentrate. R. at 76-77. He was asked about his mind racing, and he testified that "sometimes I just can't turn it off. It just seems like it just keeps running. You start thinking about things you've got to do, things you need to do, and things you hadn't done, and just it doesn't shut off. And it just – you don't get no sleep." R. at 78.

   McDonald also testified that in the 1980s he abused drugs and alcohol.  R. at 78-79.  At the time of hearing he did not drink.  R. at 79.  He last used drugs in about 1987.  R. at 83.  He had used methamphetamines and Xanax.  R. at 83.  For the last 20 years, he had not used drugs.  R. at 83.  He used to smoke, but stopped in the 1980s.  R. at 85.

   McDonald testified that in a typical day, he took out the pets, cleaned up after them, and stayed outside in a shed.  He would come inside where it is cool.  R. at 80.  He did not watch much TV.  He did not have cable.  He used the Internet for TV.  R. at 1.  He liked to go to church and play music.  R. 80.  He did not stay very long in a store because he could not stand very long.  R. at 80.

   Vocational Expert Larry Stokes testified that a hypothetical person of McDonald's age, education and work experience, with the ability to occasionally lift 50 pounds, frequently lift and carry 25 pounds, stand and walk for six hours in an eight hour day and sit for six hours in a eight hour work day, that had to avoid even moderate exposure to fumes, odors, dusts, gases and poor ventilation could not return to his past work because of the fumes, odors and dusts. R. at 88. Stokes identified other jobs that such a hypothetical person could do, including a bench assembler, sorter, cafeteria attendant, and escort vehicle driver. R. at 89-90. When asked if such an individual could

perform the listed jobs if he occasionally displayed "behavioral extremes that would be distracting to himself or others" such as "act[ing] inappropriately towards supervisors," Stokes answered, "Typically such a person would not be able to maintain employment." R. at 90. When asked if the hypothetical individual would be able to maintain work activity if he had "frequent difficulty completing normal task[s] at work and work[ing] at a consistent pace, work[ing] in coordination with other[s] without being distract[ed] by them, and maintaining attention and concentration for more than [a] brief period of time in performing at a production level expected by most employers," Stokes responded, "No." R. at 91.

Analysis

I.   Standard of Review.

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005).  Substantial evidence is more than "a mere scintilla," but less than a preponderance.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Hames v. Heckler, 707 F.2d 162, 164 (5th Cir. 1983). Alternatively, substantial evidence may be described as that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion.  Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000).  This court may not re-weigh the evidence, try the issues de novo or substitute its judgment for the Commissioner's.  Perez, 415 F.3d at 461.

The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible.  See Arkansas v. Oklahoma, 503 U.S. 91, 11360 (1992).  Despite this Court's limited function, it must scrutinize the

record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it.  Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

II.     Entitlement to Benefits under the Act.

To be considered disabled and eligible for benefits under the Act, claimant must establish that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Pursuant to the regulations promulgated under the Act, the Commissioner engages in a five-step sequential evaluation process to determine whether an individual qualifies as disabled. See 20 C.F.R. § 404.1520(a)(4). At each step, if the Commissioner determines that an individual is or is not disabled (depending on the step), her decision is made on that basis and she does not proceed to the next step. Id. Following these same five steps, the ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity (whether the claimant is working); (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals the severity of an impairment listed in 20 C.F.R., Part 404, Subpart B, Appendix 1; (4) whether the impairment prevents the claimant from doing past relevant work (whether the claimant can return to his old job); and (5) whether the impairment prevents the claimant from doing any other work.

Perez, 415 F.3d at 461. The burden of proof is on the claimant in steps one through four, and then at step five, the Commissioner must first "show that the claimant can perform other substantial work in the national economy." Id. Upon making this showing, the claimant bears the burden to rebut the finding. Id.  An assessment of the claimant's residual functional capacity is used in steps

four and five to determine the claimant's ability to perform his past work or any other type of work. Id.

### III.    Summary of the ALJ's Analysis.[4]

The ALJ found that the only severe impairments from which McDonald suffers are reactive airway disease and chronic sinusitis, but that such impairments do not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1. R. at 49-52. She further found that McDonald is unable to perform his past relevant work due to the environmental limitations in his RFC assessment, but that there are jobs that exist in significant numbers in the national economy that McDonald can perform.[5] R. at 47. As to mental impairments, the ALJ determined that McDonald's history of substance abuse in remission and bipolar disorder with psychosis, "do not cause more than minimal limitation on [McDonald's] ability to perform basic mental work activities and are therefore nonsevere." R. at 50. In coming to this conclusion, the ALJ found that the medical evidence of psychosis "is vague and incongruent", "not well described" and simply noted as "paranoia", suggesting to the ALJ that the evaluations were incomplete. R. at 50. She noted that reports of psychosis did not appear in the medical record for the 12 months required to be considered severe. R. at 50.  Even if psychosis was present, the ALJ found that McDonald had been oriented during the relevant time and had not needed hospitalization and that, therefore, any psychosis only caused minimal impairment. R. at 51.

---

[4] The Commissioner construes McDonald's statement of the issue as a challenge to both the Commissioner's step 2 finding that McDonald's mental impairments were not severe as well as a challenge of the ALJ's RFC assessment. It appears to the Court that McDonald is only challenging the RFC assessment, including the ALJ's alleged failure to properly consider the severity of McDonald's mental impairments in assessing his RFC. Because the ALJ's assessment of McDonald's mental impairments in step 2 informs the ALJ's RFC assessment, however, the Court summarizes the ALJ's analysis here.

[5] Because all findings relating to McDonald's breathing disorders are not challenged, record evidence regarding McDonald's them have been omitted from the Court's summary of the evidence.

The ALJ observed that Dr. Sholtz "noted the disorder did not seem like bipolar disorder." R. at 50. Indeed, notes from Dr. Sholtz's office dated October 23, 2013 include the remark/question, "still doesn't seem bipolar?"[6] R. at 285. Further, the ALJ found that McDonald's symptoms "are episodic and are improved with the use of his psychotropic medication." R. at 51.

In making these conclusions, the ALJ considered the four broad functional areas set out in the disability regulations for evaluating mental disorders. First, she considered activities of daily living, providing specific examples, and found that McDonald had mild limitation. R. at 51. Second, she considered social functioning, providing specific examples, and concluded he had no limitation. Though she noted that during exacerbations of bipolar disorder he gets into arguments with his bosses, she also observed that McDonald was in a long term relationship with his wife, goes to church and bible study, is able to shop for groceries, does the banking, and spends time with his niece and nephew. R. at 52. Third, she considered concentration, persistence, and pace, giving specific examples, and found no limitation. She observed he had been consistently oriented in all spheres, and could pay bills and count change, even though he could not handle a checkbook because he cannot spell. R. at 52. Fourth, she considered episodes of decompensation. She found none of any extended duration and noted that he had not required inpatient hospitalization during the relevant time. R. at 52. Based on the foregoing analysis, the ALJ concluded that McDonald's mental impairments were not severe. R. at 50. While not specifically challenging the non-severe finding, McDonald argues that the ALJ improperly minimized the severity of his mental impairments in making the RFC assessment and concluding what work McDonald would be able to do.

---

[6] These notes appear to be signed by Nurse Practitioner Mixon of Dr. Sholtz's office. Plaintiff's memorandum explains that Mixon specializes in psychiatry. (Pl.'s Mem. in Supp., at 5, ECF No. 12-2).

The ALJ's RFC assessment concluded that McDonald could perform medium work as defined in 20 CFR 404.1567(c) with occasional lifting and carrying of 50 pounds and frequent lifting and carrying of 25 pounds, standing and walking for up to six hours in an eight-hour work day and sitting for up to six hours in an eight-hour work day, but that he should avoid even moderate exposure to fumes, odors, dusts, gases, poor ventilation and pulmonary irritants in the work place. R. 53. In making this finding, the ALJ also considered McDonald's allegations of mental impairments and determined that McDonald was not fully credible. R. at 55. The ALJ considered NP Mixon's[7] note that McDonald has a general assessment of functioning ("GAF") of 40 when he started treatment, but she noted this assessment appears only once in the entire medical record and she concluded that the records show McDonald improved with medication. R. at 55. The ALJ also noted that Dr. Sholtz reported no current psychosis. R. at 55.

The ALJ gave partial weight to the opinion of Dr. Durdin who reviewed the medical evidence and performed a psychological evaluation of McDonald. R. at 55. The ALJ noted that Dr. Durdin found McDonald capable of performing work and noted he would be moderately impaired in getting along with others in a work setting but that he would be able to sustain productivity over a 40 hour work week. R. at 55. The ALJ gave the opinion only partial weight because she did not find much evidence to support Dr. Durdin's diagnosis of malingering and she determined that Dr. Durdin greatly overstated McDonald's substance abuse because the ALJ found no medical evidence of substance abuse after the alleged onset date. R. at 55. Nonetheless, the ALJ did consider Dr. Durdin's finding that the only time McDonald was diagnosed with a psychotic disorder was when he was using drugs. R. at 56.

---

[7] Throughout her opinion, the ALJ refers to a "Dr. Nixon", however, the Court's analysis of the underlying records is that the individual is Nurse Practitioner Mixon.

The ALJ gave no weight to the opinion of NP Thomas because she is neither an acceptable source of medical opinion,[8] nor is she a psychiatric treatment provider.[9] R. at 56. The ALJ pointed out that NP Thomas's notes indicate that McDonald was psychiatrically stable and had well controlled symptoms with Celexa and Depakote. Other notes indicate McDonald was paranoid and delusional (without further description), but had normal cognition and memory without homicidal or suicidal ideation. R. at 56. The ALJ concluded Ms. Thomas' treatment notes are contradictory and confusing. R. at 56.

The ALJ gave some weight to the opinion of Kevin Mixon. R. at 56. In July 2013, NP Mixon opined that McDonald was psychotic and would need to be stabilized in order to maintain sufficient attention to work, but the ALJ found this inconsistent with the medical evidence and offered at a time before McDonald's condition improved with medication.[10] R. at 56.

The ALJ "carefully considered" but did not give Dr. Sholtz's checkbox opinion controlling weight. R. at 56. On the form, Dr. Sholtz marked McDonald as having marked or extreme impairment in all categories of social interaction, concentration and persistence. R. at 517. The ALJ found the opinion inconsistent with his own records, his own prior opinion and the record as a whole. R. at 56. She found the records from Northshore Internal Medicine from November 15, 2013 through May 6, 2014, consistently reported that McDonald's symptoms were controlled by medication with the exception of one visit.  R. at 56. She noted that although Dr. Sholtz's opinion found McDonald had marked or extreme limitations in all areas of psychiatric functioning, McDonald was able to function independently and continue his activities of daily living. R. at 56.

---

[8] A nurse practitioner is not an "acceptable medical source" under the Regulations. 20 C.F.R. §§404.1513(a) and (d), 416.913(a) and (d); Boudreaux v. Soc. Sec. Admin., No. 13-CV-4949, 2014 WL 7339022 at *2 (E.D. La. Dec. 19, 2014). As the court in Boudreaux explained, an ALJ must still consider opinions from non-acceptable medical sources.
[9] On the Disability Management Solutions Medical Request Form that she filled out for CIGNA, she listed her specialty as internal medicine. R. 331.
[10] The Court notes that the ALJ construed this as the opinions of Dr. Kevin Nixon, but the Court's review indicates that the notes and forms are by Nurse Practitioner Kevin Mixon.

The ALJ also observed that McDonald had not received or been evaluated for more extensive treatment, even counseling. R. at 56. Thus, finding Dr. Sholtz's checkbox opinion inconsistent with the medial evidence and his own treatment notes, she accorded it little weight. R. at 56.

The ALJ accorded Dr. Marsiglia's opinion great weight. R. at 56. The ALJ observed that Dr. Marsiglia is a psychological specialist who reviewed the longitudinal medical record. R. at 56.Dr. Marsiglia concluded McDonald's mental impairments were not severe. R. at 56. The ALJ cites Dr. Marsiglia's opinion for concluding that McDonald "could think, communicate and care for his own needs and could get along with others." R. at 56. However, upon review of the record, it appears that this finding was made by Dr. Michael Coogan. R. 104.

In any case, the ALJ also gave great weight to the opinion of Dr. Coogan, who determined that McDonald could perform a range of medium exertional level work with environmental limitations. R. at 57.The ALJ found his opinion to be consistent with the objective medical evidence. R. at 57.

The ALJ concluded that McDonald could not perform his past relevant work because of the environmental limitations in his RFC. R. at 57. Relying on the testimony of the vocational expert, the ALJ concluded that McDonald could make a successful adjustment to other work that exists in significant numbers in the national economy. R. at 58. The ALJ noted the vocational expert's testimony that a person of McDonald's age, education, work experience and RFC would not be able to maintain employment if he would occasionally act inappropriately with supervisors or have frequent difficulty completing tasks at a reasonable time or pace. R. at 58. However, the ALJ did not analyze this latter assessment further.

IV.     Claimant's Assignments of Error

1. *Failure to include limitations in the RFC relating to mental impairment.*

McDonald argues that the RFC is not supported by substantial evidence because it does not contain any limitation relating to his bipolar disorder.  (Pl.'s Mem. Supp., at 13, ECF No. 12-2). He argues that an ALJ must include in the RFC limitations imposed by all of an individual's impairments, both severe and non-severe, 20 C.F.R. § 404.1545(e) ("When you have a severe impairment(s), but your symptoms, signs, and laboratory findings do not meet or equal those of a listed impairment in appendix 1 of this subpart, we will consider the limiting effects of all your impairment(s), even those that are not severe, in determining your residual functional capacity."). He submits that the ALJ's conclusion that McDonald's bipolar symptoms are "episodic and improving with the use of psychotropic medication" fails to acknowledge that different treating sources at different times all concluded that McDonald had an impaired ability to concentrate, deal with others and perform at a consistent pace. Id. He submits that the record contains no medical assessment supporting the RFC because McDonald is "more limited" than the ALJ found. Id. at 14.

As discussed further below, the ALJ concluded that McDonald's mental impairments are non-severe and controlled by medication. In assessing McDonald's RFC, the ALJ considered the opinions of medical practitioners regarding McDonald's alleged mental impairments. Despite McDonald's contention to the contrary, the record reflects that the ALJ considered McDonald's alleged mental impairments in conducting her RFC assessment when she rejected the opinions that found McDonald's ability to work impaired by his alleged mental impairments and accepted the opinions that founds McDonald's ability to work was not impaired. Further, as discussed below, the ALJ's conclusions are supported by substantial evidence.

2. *Discounting the treating physician's opinion.*

McDonald contends that the ALJ ignored the objective medical evidence. Id. at 14. He submits that a treating physician's opinion must be given great weight if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence. See Newton v. Apfel, 209 F.3d 448, 455 (5th Cir. 2000) ("A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with . . . other substantial evidence.'") (quoting Martinez v. Chater, 64 F.3d 172, 176 (5th Cir. 1995)). McDonald submits that Dr. Sholtz's findings of significant limitation in social functioning, concentration, persistence, pace and adaptation are supported by his clinical notes and by the findings of NP Thomas and NP Mixon. (Pl.'s Mem. Supp., at 14, ECF No. 12-2) Thus, he argues, the ALJ improperly minimized Dr. Sholtz's findings. Id.

McDonald adds that even if not giving the treating physician's opinion great weight, the ALJ must still give it deference. Id. at 15. He cites Newton, but this case does not require deference in all circumstances.[11] In Newton, the Fifth Circuit explained that a treating physician's diagnosis "should be afforded considerable weight in determining disability," but that such opinions are not conclusive and "may be assigned little or no weight when good cause is shown." 209 F.3d at 455–56. Good cause may exist when "the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory or diagnostic techniques, or is otherwise unsupported by the evidence." Id.  at 456.

---

[11] The Newton case cites Social Security Ruling 96-2p, which states "Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927." Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions, 61 FR 34490-01.

McDonald correctly points out that the Fifth Circuit in <u>Newton</u> required that an ALJ must consider the following factors "before declining to give any weight to the opinions of the claimant's treating specialist:" the physician's length of treatment, frequency of examination, nature and extent of the treatment relationship, supporting evidence in the medical record, consistency of the opinion with the record as a whole, and the specialization of the treating physician. <u>Id.</u> at 457. In <u>Newton</u>, the ALJ had failed to consider the factors, and the Fifth Circuit ordered that it do so on remand. <u>Id.</u>  The Fifth Circuit in <u>Newton</u> explained that an ALJ may only reject a treating physician's medical opinion if the ALJ goes through a detailed analysis of the aforementioned factors, or if there is reliable medical evidence from a treating or examining physician that controverts the opinion. <u>Id.</u> at 453.

McDonald argues that the burden is on the Commissioner to show good cause why the conclusion of the treating physician should be accorded anything less than substantial weight. (Pl.'s Mem. Supp., at 16, ECF No. 12-2). He adds that the ALJ failed to evaluate the nature and extent of McDonald's treatment relationship with Dr. Sholtz and the supportability of Dr. Sholtz's opinion. <u>Id.</u>

The Commissioner counters that the ALJ appropriately discounted Dr. Sholtz's June 25, 2014 opinion because it was a checkbox opinion inconsistent with the medical evidence, including his own treatment notes. R. at 7. She argues that checkbox forms are not entitled to controlling weight in such circumstances. R. at 7.; <u>see</u> <u>Perez v. Barnhart</u>, 415 F.3d 457, 466 (5th Cir. 2005) (recognizing that a treating physician's opinion can be given little or no weight when they are "brief and conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques, or otherwise unsupported by the evidence") (quoting <u>Greenspan v. Shalala</u>, 38 F.3d 232, 237 (5th Cir. 1994) (emphasis omitted).

The Court finds that the ALJ analyzed and was reasonable in deciding to discount the June 24, 2014 opinion of Dr. Sholtz. The opinion was a cursory, checkbox form filled out by Dr. Sholtz weeks after McDonald's last visit with the office. R. 516-519.  As the <u>Netwon</u> court observed, good cause may permit the discounting of such conclusory opinions. 209 F.3d at 456. The ALJ also found that Dr. Sholtz's checkbox opinion was not supported by the medical evidence, another basis the <u>Newton</u> court stated may support good cause to discount a treating physician's opinion. <u>See id.</u>  The Court finds that substantial evidence supports this conclusion. The ALJ found Dr. Sholtz's opinions to be inconsistent with his own notes which, in October 2014, questioned whether McDonald even suffered from bi-polar disorder. In February 2014, Dr. Sholtz filled out a form in which he remarked that McDonald was functioning poorly "*because he was off meds.*" R. 328 (emphasis added). This supports the ALJ's conclusion that McDonald's mental impairments were controlled my medication, and is contrary to Dr. Sholtz's checkbox opinion. The ALJ also considered that Dr. Sholtz's notes, such as those reporting McDonald's poor condition was a result of him ceasing medications, indicated that McDonald improved with medication. Finally, the ALJ found Dr. Sholtz's assessment that McDonald had extreme or marked limitations in all areas of psychiatric functioning to be inconsistent with the fact that by McDonald's own testimony, he could continue with his activities of daily living. The ALJ also observed that McDonald had not received any counseling or other specialized psychiatric treatment.  The ALJ also considered the opinions of Dr. Marsiglia, Dr. Coogan, and Dr. Durdin which indicate McDonald is improved with medication, consistent with the remarks of Dr. Sholtz in February 2014.

While not listing them out specifically, the ALJ considered the factors required by the Fifth Circuit before discounting a treating physician's opinion.[12] The ALJ explicitly considered the lack

---

[12] These factors are the physician's length of treatment, frequency of examination, nature and extent of the treatment relationship, supporting evidence in the medical record, consistency of the opinion with the record as a whole, and the

of supporting evidence in the medical record (including Dr. Sholtz's prior opinion) and the record

as a whole (especially his ability to perform activities of daily living). R. at 56. The ALJ considered

the length of treatment when she noted Dr. Sholtz's diagnosis as early as July 2013. R. at 50. The

ALJ recognized Dr. Sholtz as a "psychiatrist", thereby considering his specialty in psychiatry. R.

at 50.    She considered the frequency of examination when she recounted Dr. Sholtz's previous

diagnosis and assessments, R. at 50, and again when she referenced Dr. Sholtz's own inconsistent

records and prior opinion in discounting the checkbox opinion.[13] R. at 56. The ALJ considered the

extent of the relationship by considering Dr. Sholtz's previous diagnosis and notes. The Court adds

that contrary to McDonald's contentions of his regular visits with Dr. Sholtz, the medical evidence

indicates that McDonald more often saw NP Mixon when he visited the Northshore Psychiatric

Care.[14] Accordingly, the Court finds that the ALJ made her decision to discount the opinion of Dr.

Sholtz after considering the required factors and that her determination that she had good cause to

discount his opinion[15] is supported by substantial evidence.

---

specialization of the treating physician. 209 F.3d at 456. As discussed above, the ALJ can discount a treating physician's opinion without consideration of the factors if there is reliable medical evidence from a treating or examining physician that controverts the opinion. Id. at 453. Here, arguably in discounting Dr. Sholtz's check box opinion, the ALJ relied on the Dr. Sholtz's own earlier and conflicting opinion indicating that McDonald's mental impairments were improved with medication. Additionally, in conducting the RFC assessment, the ALJ relied in part on the opinion of Dr. Durdin, Ph.D., a clinical psychologist who had examined McDonald. Dr. Durdin concluded that his impairments in getting along with others in the work place were only moderate and concluded that his mental impairments would not interfere with his ability to sustain productivity at work. R. at 313.

[13]  For example, the ALJ referred to Dr. Sholtz's July 2013 diagnosis, R. at 50, and Dr. Sholtz's August 2013 notes, R. at 50. Without noting the date she referred to a diagnosis by Dr. Sholtz and cited notes dated October 2013. She also referred to Dr. Sholtz's notes about McDonald in January 2014, R. at 51.

[14] It appears that McDonald first reported to Northshore Psychiatric Care in June 2013. Although prescriptions were signed by Dr. Sholtz at that time, notes indicate McDonald was seen by NP Mixon in June, July, August, and September 2013. The first document with notes of Dr. Sholtz is dated February 24, 2014, and that document appears to be based on a January 2014 examination with notes taken by NP Mixon. Additional notes of Dr. Sholtz are dated June 9, 2014, and September 14, 2014.

[15] The Court recognizes that the ALJ did not specifically use the language "good cause," but finds that the ALJ's thorough consideration of Dr. Shlotz's opinion and the lack of supporting evidence indicates a good cause finding.

3.  *Failure to find that McDonald's impairments cause significant problems with concentration and dealing with others.*

McDonald also argues that the ALJ failed to find that McDonald's mental impairment was severe despite evidence from multiple treating sources that his bipolar disorder causes significant problems with concentration and dealing with others. (Pl.'s Mem. Supp., at 17, ECF No. 12-2). He notes that Dr. Durdin's opinion indicated that McDonald had at least moderate limitation in dealing with others in a work setting. Id. at 17. Further McDonald submits that his own testimony indicates he has significant difficulties in dealing with others. Id. McDonald submits that Dr. Sholtz has been treating McDonald since the onset of his symptoms, has treated him on several occasions and is a psychiatrist and neurologist, a specialty appropriate for assessing bipolar disorder. Id. McDonald argues that Dr. Sholtz's opinion is supported by record evidence including the findings of NP Mixon, Dr. Durdin, and NP Thomas. Id. at 18. He submits that "every single medical source who has examined McDonald has noted significant problem [sic] with anxiety, bipolar disorder or other mental disorder." Id. The Court disagrees with this assessment as the medical evidence is far more varied, with each cited medical source sometimes assessing problems and other times improvement.

The Court finds that considering the record as a whole, the ALJ's conclusion that McDonald's mental disorder is not severe and is controlled by medication is supported by substantial evidence. As noted above, this Court has found the ALJ did not err in discounting Dr. Sholtz's checkbox opinion as conclusory and unsupported by the medical evidence. There is evidence indicating that McDonald's mental impairments are controlled by medication. In February 2014, Dr. Sholtz opined that McDonald's depression was "because he was off meds," indicating that McDonald was in an improved condition when on his medication. R. 328. Notes of NP Thomas explicitly report that McDonald's symptoms were under control with medication. R.

24

at 342, 356. Similarly, McDonald's own testimony is that his paranoia was better with medication. R. at 76. While he stated he felt anxious around authority figures, he also admitted he did not feel anxious at home. Although he testified that his mind would race, a review of the cold transcript does not indicate that McDonald himself was asserting severe issues with anxiety or concentration. McDonald's own report of the activities he can perform indicates that he is able to function in activities of daily living. Without further argument, McDonald argues that the ALJ's adverse credibility finding (presumably regarding McDonald's own testimony) was legally improper. (Pl.'s Mem. Supp., at 18, ECF No. 12-2). The ALJ is in the best position to consider McDonald's credibility. Moreover, in light of McDonald's testimony and the information he provided in his forms, the ALJ had substantial evidence to discount McDonald's claim that his difficulty concentrating or interacting with authority was severe.

The analysis of Ph.D Durdin, which the ALJ gave partial weight, also supports the ALJ's conclusion that McDonald's mental disorders are controlled by his medication. Further, the analysis of Ph.D Marsiglia, who had access to all of McDonald's medical records, found McDonald's affective disorders non-severe. As the ALJ noted, McDonald has not been hospitalized in recent years for his mental disorder. There is no evidence in the record of a history of trouble holding a job. Substantial evidence supports the ALJ's conclusion that McDonald's mental disorder was non-severe.

4.  *Misreading notes regarding substance abuse.*

McDonald submits that the ALJ has mischaracterized the evidence when concluding that McDonald improved with medication, and that the ALJ misread Dr. Sholtz's July 2013 notes because Dr. Sholtz was merely referencing a history of substance abuse, not finding current substance abuse. (Pl.'s Mem. Supp., at 18, ECF No. 12-2).   As the Commissioner points out, the

ALJ specifically concluded that there was no evidence of continued substance abuse. R. at 55. The ALJ's decision was not based on any determination that McDonald was currently suffering from a substance abuse disorder and, accordingly, there is no error on this basis.

     5.   *Evidence submitted to Appeals Council.*

McDonald also leans on the additional evidence submitted to the Appeals Council. (Pl.'s Mem. Supp., at 19, ECF No. 12-2). This evidence concerns McDonald's complaint of neck pain and a diagnosis of degenerative disc disease. McDonald points to one section of Dr. Plunkett's checkbox form where Dr. Plunkett indicates McDonald's "pain or other symptoms" are severe enough to constantly interfere with the attention and concentration needed to perform simple work tasks. R. at 10. It is not clear how this analysis supports any findings of Dr. Sholtz regarding McDonald's mental disorders as McDonald argues. Moreover, the cited evidence concerns a time period following the ALJ's decision. As the Appeals Council pointed out, such evidence cannot be considered on appeal.[16]

     6.   *Failure to rely on vocational expert's testimony regarding a person with behavioral issues and difficult concentrating.*

Finally, McDonald submits that the vocational expert testified that if McDonald displayed behavioral extremes that would be distracting to himself and others, he would not be able to work. (Pl.'s Mem. Supp., at 19, ECF No. 12-2). He adds that the expert testified that if McDonald had frequent difficulty completing normal tasks and work at a consistent pace and struggled to work in coordination with others and maintain attention and concentration, he would be unable to

---

[16] While McDonald is correct that the record before the Appeals Council is the record on appeal to the District Court, the regulations require that "If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. § 404.970. Thus, the evidence submitted by McDonald is not part of the record here because it was not considered part of the record on review by the Appeals Council.

maintain employment. Id.  McDonald seems to be arguing that he fits the description of the hypotheticals and that the ALJ should have determined that McDonald would, therefore, not be able to maintain employment. The Commissioner urges that the ALJ properly relied on the vocational expert's testimony that other jobs were available for a person of McDonald's age, education, and prior work experience. (Def.'s Mem. Supp., at 12, ECF No. 13-1). The Commissioner notes that once she has met her burden of showing alternative jobs are available, the claimant must prove that he cannot perform the alternate work. Id.  She insists that McDonald has failed to meet that burden.

In considering the ALJ's determination of McDonald's RFC and her conclusion that other jobs that he could do are available, the Court is mindful that a vocational expert's assessment must consider a person's mental impairments where that person has a dysfunctional personality. See Tennant v. Schweiker, 682 F.2d 707, 711 (8th Cir. 1982) (rejecting the vocational expert testimony which had not considered the claimant's personality disorder, reversing and holding the claimant disabled). Citing Tenant, the United States Court of Appeals for the Fifth Circuit held that "a finding that a claimant is able to engage in substantial gainful activity requires more than a simple determination that the claimant can find employment and that he can physically perform certain jobs; it also requires a determination that the claimant can *hold* whatever job he finds for a significant period of time." Singletary v. Bowen, 798 F.2d 818, 822 (5th Cir. 1986); see Watson v. Barnhart, 288 F.3d 212, 217–18 (5th Cir. 2002) (explaining that the Singletary holding extends to intermittent physical symptoms). The Fifth Circuit in Singletary found substantial evidence of the claimant's personality disorder affecting his ability to maintain a job including a job history that showed he had never held a job for a long period of time, repeated hospitalization for psychiatric problems over a long period, and a record full of discussions of the claimant's

inappropriate behavior and poor social adjustment. 798 F.2d at 822. Finding that the ALJ had failed to consider the claimant's ability to maintain a job, but instead merely determined that the claimant was physically able to perform a dishwashing job, the court of appeals remanded to the district court with instructions to remand to the Secretary of Health and Human Services. Id.  at 823. More recently, the Fifth Circuit clarified that "in order to support a finding of disability, the claimant's intermittently recurring symptoms must be of sufficient frequency or severity to prevent the claimant from holding a job for a significant period of time." Frank v. Barnhart, 326 F.3d 618, 619 (5th Cir. 2003).

The Court also notes that, as the Commissioner points out, impairments controlled by medication are not disabling. James v. Bowen, 793 F.2d 702, 706 (5th Cir. 1986); Taylor v. Bowen, 782 F.2d 1294, 1298 (5th Cir. 1986).  For example, in Garcia v. Astrue, the Fifth Circuit affirmed the district court's finding of no disability where medical reports indicated that depression, headaches and difficulty concentrating were well controlled with medication. 293 F. App'x 243, 245–46 (5th Cir. 2008) (unpublished). "If, however, the claimant cannot afford the prescribed treatment and can find no way to obtain it, the condition that is disabling in fact continues to be disabling in law." Taylor, 782 F.2d at 1298. Although notes of NP Mixon and the opinion of Dr. Sholtz indicate that McDonald had ceased treatment because he could not afford the medication, McDonald made no representation at the hearing before the ALJ or in his briefing before this Court that he is currently unable to afford his medications. Indeed, his testimony indicated that he was taking his prescribed medication at the time of the hearing.

McDonald complains that the ALJ did not consider McDonald's mental impairments when assessing his RFC despite the vocational expert's testimony regarding the inability of person with behavioral and concentration issues to maintain employment. However, it appears this is because

the ALJ concluded that McDonald's mental or personality disorder would not impair his ability to maintain employment. The vocational expert upon which the ALJ relied testified that a person with McDonald's age, education, and work history McDonald would not be able to maintain employment if he 1) acted angrily and inappropriately towards a supervisor or 2) had frequent difficulty completing normal tasks and working at a consistent pace, working in coordination with others without being distracted, and maintaining attention and concentration for more than a brief period of time.  Although the ALJ did not analyze this assessment, she cited it in her opinion. In discounting the opinions of Dr. Sholtz and NP Mixon and questioning McDonald's credibility to some extent, the ALJ seems to have found that McDonald would not act angrily or inappropriately or have frequent difficulty maintaining concentration, attention or pace. Instead, the ALJ relied on the conclusions of Dr. Marsiglia, who found McDonald's difficulty in maintaining social functioning mild, and Dr. Coogan who concluded that McDonald was able to think, communicate and care for his own needs and get along with others, do his usual daily activities and remember and follow basic instructions. The ALJ's RFC assessment and conclusion that McDonald would be able to obtain and maintain other employment is supported by substantial evidence.

## RECOMMENDATION

Accordingly, IT IS RECOMMENDED that:  (1) the Commissioner's cross-motion for summary judgment (Rec. doc. 13) be GRANTED; and (2) McDonald's motion for summary judgment (Rec. doc. 12) be DENIED.

## OBJECTIONS

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within fourteen (14) calendar days after being served with a copy shall bar that party, except upon grounds of plain error, from

attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  <u>Douglass v. United Servs. Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 8th day of November, 2016.

**Janis van Meerveld**
**United States Magistrate Judge**